## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

VIRGIL LONDY GREER,      )
                             )     Civil Action No. 12 - 1263
          Petitioner,    )
                             )
           v.             )     Magistrate Judge Lisa Pupo Lenihan
                             )
SUPERINTENDENT MICHAEL   )
HARLOW and THE ATTORNEY   )
GENERAL OF THE STATE OF    )
PENNSYLVANIA,           )
                             )
          Respondents.   )

## MEMORANDUM OPINION

Petitioner, Virgil Londy Greer (hereinafter referred to as "Greer" or "Petitioner"), a state prisoner, has petitioned the Court for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (the "Petition").  For the reasons that follow, the Petition will be denied.

## I.    Relevant Factual History

The following recitation is taken from the Opinion of the PCRA court dated December 27, 2010, which was adopted by the Pennsylvania Superior Court on appeal from the denial of PCRA relief.

> In 1995, Charlene Washington, (hereinafter referred to as "Washington"), lived in the Broadhead Manor Complex in the West End of the City of Pittsburgh. Washington's younger brother, James Washington, was a manager at a local McDonald's Restaurant and he would see her on a fairly frequent basis when she would come into his restaurant.  In addition to these visits, James Washington would also stop by his sister's apartment on his day off since he was worried about her continued use and abuse of drugs.  On April 18, 1995, James Washington decided to visit his sister's apartment since he had not seen her in a couple of weeks.  When he reached the apartment, he called out for her to open the door.  Getting no response, he looked around and saw an open window and

climbed through the window and once again called for his sister. When he was on the first floor in the living room, he noticed that a sliding glass door in the living room was partially opened. He proceeded up the steps to the bedroom, again calling out for his sister and, again, he got no response. When he went into her bedroom, he saw her lying on the bed unresponsive. As he got closer he noticed blood on the sheets of the bed and the numerous stab wounds of her body. James Washington then left her apartment and went to the Housing Authority Police building and told them what he had found.

The autopsy that was performed on Washington revealed that she had twenty stab wounds in the neck and chest area which resulted in the perforation of her right lung and right kidney. There were additional stab wounds to the neck; however, they did not appear to have hit any major blood vessels or arteries. It was the opinion of Dr. Leon Rosen, who performed the autopsy, that the cause of death was multiple stab wounds that Washington sustained to her chest and that the manner of death was a homicide.

When the police processed the crime scene, they took into evidence the sheets from Washington's bed and submitted them to the Crime Lab. A DNA analysis was done of the blood stains on those sheets and it was determined that in addition to Washington's blood, some of the bloodstains contained the blood of another individual. Homicide Detectives assigned to this case interviewed Washington's neighbors and acquaintances and people with whom she had intimate or sexual relationships; however, they were unable to come up with a suspect and eventually this homicide became a cold case.

On October 21, 2004, Homicide Detectives assigned to the cold case unit received a letter from the Crime Lab indicating that the Lab had been notified of a potential match to the other blood stains found on Washington's sheets. The Crime Lab had submitted those stains to a national database and the database indicated that there was a possible DNA match with Greer. Homicide Detectives Smith and Rush located Greer and asked him to come to Homicide headquarters. Prior to having Greer come to headquarters, they received a search warrant that enabled them to have blood drawn from Greer so that a definitive DNA analysis could be done. On October 22, 2004, Greer was at the police headquarters and was given his Miranda rights and submitted to the blood draw. That blood draw ultimately confirmed that Greer's blood was on Washington's sheets.

After submitting to the blood draw, Greer was interviewed by Detective Dennis Logan, (hereinafter referred to as "Logan" or "Det. Logan"), and during the course of the interview he gave Logan five different stories with respect to his involvement in this homicide. Initially, he told Logan that he did not know the victim and he was never present in her apartment. When confronted with the fact that his blood was in her apartment, he then told Logan that he did know the

victim and that she babysat for his daughter since she was a friend of his girlfriend. When he was told that his blood was found in the stains on Washington's sheets, he then told Logan that he did know Washington and that he had consensual sex with her.

Greer's fourth version of what happened in Washington's apartment was that he had seen her outside of her apartment and she was holding two cans of beer. She offered him one beer and suggested that they go to her apartment to drink that beer. While drinking the beer and engaging in idle conversation, Greer agreed to have sex and they went into her bedroom and were having sex when two black males came into her house and they began to attack her. She then used Greer as a shield against these individuals and he was able to get away from these individuals, grab his clothes and then run out of the apartment. He also told Logan that he had cut his finger on the beer can.

Finally, Greer told Logan that he had arrived on the night of the murder in the West End by bus with his daughter Robin. He was taking his daughter back to her mother when he ran into Washington. She told him that the child's mother was not home but would be home shortly. During their conversation, his daughter began playing with the other children outside and Greer continued his conversation with Washington. Washington had two beers and she offered one to him and she suggested that they go to her house. Greer told his daughter where he was going and that he would be right back. Once they had finished drinking the beer, Washington asked Greer if he had any money and he said yes and then she said she would be willing to have sex with him for $20.00. They went upstairs, had sex, and Washington asked for her $20.00, Greer told her that he was only going to pay $10.00. She became mad, pulled a knife and then came after him. He was able to wrestle the knife away from her and then stabbed her; however, he did not remember how many times he did stab her. Greer then got dressed and took the bus back to his residence in Elizabeth. He also told Logan that he was cut by the knife and not by the beer can.

Logan asked Greer to put his statement on tape and he agreed to do that; however, while they were setting up the tape equipment and getting other Detectives to be witnesses to this taped confession, Greer changed his mind. Greer was given Logan's notes to read and was asked if they were correct. Greer made a couple of corrections by scratching out the information on the form and inserting the correct facts and Greer initialed those changes and signed each panel of the note form. Greer was then arrested and charged with Washington's murder.

(Opinion of PCRA court dated Dec. 27, 2010, ECF No. 10-3 at pp.3-8.)

## II.     <u>Relevant Procedural History</u>

Petitioner was charged by Information filed November 19, 2004, in the Court of Common Pleas of Allegheny County at CC No. 200414970 with one count of Criminal Homicide, 18 Pa. C.S.A. § 2504, arising from the death of Charlene Washington on or about April 18, 1995.  (Resp't Ex. 1, Docket, ECF No. 10-1 at pp.1-12.)

Petitioner proceeded to trial by jury before Judge Cashman on November 14, 2007.  He was represented at trial by Attorney John Elash and Attorney Phillip P. DiLucente.  Assistant District Attorney (ADA) Laurel Brandstetter appeared for the Commonwealth.

On November 19, 2007, the jury returned its verdict, finding Petitioner guilty of First Degree Murder.  Petitioner was sentenced on February 13, 2008 to a mandatory term of life imprisonment.

On March 14, 2008, Attorney Kirk Henderson, with the Office of the Public Defender of Allegheny County, filed a Notice of Appeal to the Superior Court, which was docketed at 508 WDA 2008.  (Resp't Ex. 2, Docket, ECF No. 10-1 at pp.13-15.)  Subsequently, however, on June 9, 2008, Attorney Henderson filed a Pracecipe to discontinue the appeal.  Id.

Petitioner filed a *pro se* Post-Conviction Collateral Relief Act ("PCRA") Petition on July 30, 2008.  (Resp't Ex. 3, *pro se* PCRA Petition, ECF No. 10-1 at pp.16-39.)  Attorney Patrick K. Nightingale was appointed to assist him in connection with post-conviction proceedings.

Attorney Nightingale filed an Amended PCRA Petition on February 4, 2009, and raised the following claims:

1.  Counsel was ineffective for failing to move for a mistrial after Det. Logan's testimony, which commented on Petitioner's right to remain silent.

4

2. Mr. Elash and Mr. DiLucente were ineffective for forcing Petitioner to remain silent when it was Petitioner's stated desire to counsel that he wanted to testify on his own behalf.

3. Mr. Elash and Mr. DiLucente were ineffective for failing to file and litigate a Motion to Suppress Defendant's statement to Det. Logan.

(Resp't Ex. 4, Amended PCRA Petition, ECF No. 10-2 at pp.1-20.)

The Commonwealth, through ADA Ronald M. Wabby, Jr., filed an Answer to the Amended PCRA Petition on March 9, 2009. (Resp't Ex. 5, Commonwealth's Answer, ECF No. 10-2 at pp.20-41.) With Judge Cashman presiding, a PCRA hearing was held on the petition on July 20, 2009. Subsequently, Judge Cashman issued an Order denying relief on July 28, 2009. (Resp't Ex. 6, Order dated July 28, 2009, ECF No. 10-2 at p.42.)

Attorney Nightingale filed a timely Notice of Appeal to the Pennsylvania Superior Court, which was docketed at 1320 WDA 2009. (Resp't Ex. 7, Docket Sheet, ECF No. 10-2 at pp.43-46; Ex. 8, Notice of Appeal, ECF No. 10-3 at p.1.) Judge Cashman issued his Opinion on December 27, 2010. (Resp't Ex. 9, Opinion dated Dec. 27, 2010, ECF No. 10-3 at pp.2-17.)

On March 21, 2011, Petitioner submitted a brief to the Pennsylvania Superior Court raising the following issues:

1. Whether the trial court erred when it denied Defendant's Petition for Post Conviction Relief wherein Defendant alleged trial counsel's ineffectiveness for failing to remain silent by stating, in response to a question about Defendant's demeanor at the time he was interviewed by Detective Logan, that "your client would have to answer to that;"

2. Whether the trial court erred when it denied Defendant's Petition for Post Conviction Relief wherein Defendant alleged trial counsel's ineffectiveness because trial counsel threatened to quit if Defendant testified on his own behalf thereby depriving Defendant of his constitutionally guaranteed right to testify; and

3. Whether the trial court erred when it denied Defendant's Petition for Post Conviction Relief wherein Defendant alleged trial counsel's ineffectiveness for failing to litigate a Motion to Suppress Defendant's statement to Detective Logan.

(Resp't Ex. 10, Appellant's Brief, ECF No. 10-3 at pp.18-42.)

On April 5, 2011, the Commonwealth, through ADA Sandra Preuhs, filed a brief in response to Petitioner's appellate arguments. (Resp't Ex. 11, Appellee's Brief, ECF No. 10-4 at pp.1-35.)

On June 22, 2011, the Pennsylvania Superior Court issued a Judgment Order addressing Petitioner's appeal from the PCRA court's Order dated July 28, 2009. (Resp't Ex. 12, J. Order dated July 28, 2009, ECF No. 10-4 at pp.36-37.) The Pennsylvania Superior Court in its Judgment Order stated that the trial court's December 27, 2010 Opinion "ably sets forth the factual history of this case, and sufficiently addresses each of Appellant's claims. Accordingly, we adopt Judge Cashman's Opinion as our own." Id.

On July 8, 2011, Petitioner, through Attorney Nightingale, filed a Petition for Allowance of Appeal ("PAA") to the Pennsylvania Supreme Court, docketed at 350 WAL 2011. (Resp't Ex. 13, Docket, ECF No. 10-4 at pp.38-40; Resp't Ex. 14, PAA, ECF No. 10-5 at pp.1-40.) In his Petition, Petitioner, through Attorney Nightingale raised the following issue:

1. Whether the Superior Court of Pennsylvania erred when it affirmed the judgment of the trial court when it denied Defendant's Petition for Post Conviction Relief wherein Defendant alleged trial counsel's ineffectiveness because trial counsel threatened to quit if Defendant testified on his own behalf thereby depriving Defendant of his constitutionally guaranteed right to testify.

Id. The Commonwealth, represented by ADA Preuhs, chose not to respond to Petitioner's PAA. (Letter to Prothonotary from ADA Preuhs dated July 11, 2011, ECF No. 10-3 at p.43.)

By Order dated October 17, 2011, the Pennsylvania Supreme Court denied Petitioner's

PAA.  (Resp't Ex. 13, Order dated Oct. 17, 2011, ECF No. 10-5 at p.41.)

On August 27, 2012,[1] Petitioner, *pro se*, filed his Petition for Writ of Habeas Corpus.[2]

(ECF No. 1-2.)  He raises the following claims in his Petition:

1. Trial counsel provided ineffective assistance of counsel when he failed to
   move to suppress evidence; specifically, Petitioner's statement to detectives
   after Petitioner invoked his right to counsel.

2. Trial counsel provided ineffective assistance of counsel when he prevented
   Petitioner to testify on his own behalf; specifically, trial counsel threatened
   Petitioner that if Petitioner took the stand to testify, then trial counsel would
   remove himself from the case.

3. Trial counsel provided ineffective assistance of counsel when he failed to
   challenge the prosecutor's case; specifically, trial counsel failed to challenge
   certain DNA evidence and an alleged confession that were not subjected to
   any meaningful testing.

---

[1] This is the filing date under the "mailbox rule."  Pennsylvania and federal courts employ the prisoner mailbox rule.  *See Perry v. Diuglielmo, 169 Fed. Appx. 134, 136* n.3 (3d Cir. 2006) (citing Commonwealth v. Little, 716 A.2d 1287 (Pa. Super. Ct. 1998)); Burns v. Morton, 134 F.3d 109, 113 (3d Cir. 1998).  Under this doctrine, a prisoner's *pro se* pleading is deemed filed when delivered to prison officials for mailing.  *See Burns, 134 F.3d at 113*; Commonwealth v. Castro, 766 A.2d 1283, 1287 (Pa. Super. Ct. 2001) (deemed filed when given to proper prison authority or placed in a prison mailbox).

[2] Respondent maintains that the Petition is untimely.  However, Respondent's calculation of the statute of limitations period is incorrect.  The Petition was actually timely filed by one day.  *See* 28 U.S.C. § 2244(d)(1).  Petitioner discontinued his direct appeal on June 9, 2008, and his one year statute of limitations period started to run the next day.  In other words, June 10th counted as day one.  Petitioner then filed his *pro se* PCRA Petition on July 30, 2008, fifty days later, and his statute of limitations period was tolled pending those postconviction proceedings, which ended when the Pennsylvania Supreme Court denied Petitioner's PAA on October 17, 2011.  His statute of limitations period started to run again on October 18, 2011, and continued to run for 314 days until Petitioner initiated these proceedings on August 27, 2011.  As such, only 364 days of Petitioner's one year statute of limitations period expired, making the Petition timely filed by one day.

## III.  Habeas Standard

Where the state courts have reviewed a federal issue presented to them and disposed of the issue on the merits, AEDPA provides the applicable deferential standards by which the federal habeas court is to review the state court's disposition of that issue.  *See* 28 U.S.C. § 2254(d) and (e).  In Williams v. Taylor, 529 U.S. 362 (2000), the Supreme Court expounded upon the standard found in 28 U.S.C. § 2254(d).  In Williams, the Court explained that Congress intended that habeas relief for errors of law may only be granted in two situations: (1) where the State court decision was "contrary to . . . clearly established Federal law as determined by the Supreme Court of the United States" or (2) where the State court decision "involved an unreasonable application of[] clearly established Federal law as determined by the Supreme Court of the United States."  Id. at 404-05.  The Court explained the two situations in the following terms:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams, 529 U.S. at 412-13.  The Court of Appeals for the Third Circuit has also elucidated the "contrary to" clause by noting that "it is not sufficient for the petitioner to show merely that his interpretation of Supreme Court precedent is more plausible than the state court's; rather, the petitioner must demonstrate that Supreme Court precedent requires the contrary outcome."  Werts v. Vaughn, 228 F.3d 178, 197 (3d Cir. 2000) (quoting Matteo v. Superintendent, SCI-Albion, 171 F.3d 877, 888 (3d Cir. 1999) (*en banc*)).  Moreover, the "unreasonable application"

test is an objective one; "a federal court may not grant habeas relief merely because it concludes that the state court applied federal law erroneously or incorrectly." Jacobs v. Horn, 392 F.3d 92, 100 (3d Cir. 2005) (citation omitted). It is Petitioner's burden to prove the State court decision is either contrary to or an unreasonable application of clearly established federal law. *See* Matteo, 171 F.3d at 888; Werts, 228 F.3d at 197.

AEDPA also permits federal habeas relief where the State court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Section 2254(d)(2) mandates the federal habeas court to assess whether the state court's determination was reasonable or unreasonable given that evidence. If the state court's decision based on such a determination is unreasonable in light of the evidence presented in the state court proceeding, habeas relief is warranted. Within this overarching standard, of course, a petitioner may attack specific factual determinations that were made by the state court, and that are subsidiary to the ultimate decision. Here, section 2254(e)(1) comes into play, instructing that the state court's determination must be afforded a presumption of correctness that the petitioner can rebut only by clear and convincing evidence.

IV. <u>**Discussion**</u>

With these principles in mind, the Court turns to the facts of this case. In his Petition, Petitioner raises three claims of ineffective assistance of counsel.

Ineffective assistance of counsel claims are "governed by the familiar two-prong test set forth in Strickland v. Washington, 466 U.S. 668 (1984)." Shelton v. Carroll, 464 F.3d 423, 438 (3d Cir. 2006) (citing Wiggins v. Smith, 539 U.S. 510, 521 (2003)). For AEDPA purposes, the

Strickland test qualifies as "clearly established Federal law, as determined by the Supreme Court." Williams v. Taylor, 529 U.S. 362, 391 (2000). Under Strickland, a habeas petitioner must demonstrate that: (1) counsel's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's error, the result would have been different. 466 U.S. at 687. For the deficient performance prong, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Id. at 688. To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. With respect to the sequence of the two prongs, the Strickland Court held that "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." 466 U.S. at 697.

In assessing an ineffective assistance of counsel claim, "the ultimate focus of inquiry must be on the fundamental fairness of the proceeding . . . . In every case the court should be concerned with whether . . . the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." Id. at 696.

A. **Failure to file a motion to suppress.**

In his first claim, Petitioner alleges that his trial counsel were ineffective for failing to present evidence in a motion to suppress indicating that Petitioner's statement to Det. Logan was

given after he invoked his right to counsel. Specifically, Petitioner states the following in his Petition:

> Petitioner was arrested and interrogated by detectives and ended the interrogation by invoking the right to counsel. The following day at the instance of the detectives petitioner was reinterrogated and a statement from petitioner was produced. Trial counsel failed to move to have the statement suppressed.

(ECF No. 3 at p.5.) Petitioner presented this claim in his Amended PCRA Petition, and, after raising the claim, the court determined that an evidentiary hearing was necessary in order to determine whether Petitioner was entitled to relief on any of his ineffectiveness claims. As such, on July 20, 2009, Petitioner, Attorney Nightingale, and ADA Wabby appeared before Judge Cashman for an evidentiary hearing.

The following background is relevant with respect to this claim.

Det. Smith testified at trial that Petitioner was located on October 22, 2004, for the execution of a search warrant for a blood sample. (TT at p.136.) Petitioner was taken for the blood draw and then taken to the homicide office, where he was read the Pittsburgh Police Pre-Interrogation Warning form. (TT at p.137.) According to Det. Smith, Petitioner was cooperative with the blood draw, and cooperative through the reading of the rights form, stating that he understood, and he initialed the form (TT at p.138), which was signed by Det. Smith and his partner Det. Rush (TT at p.139). He noted that Petitioner did not indicate any reluctance in speaking to the police. (TT at p.139.)

On cross-examination, when asked if he spoke to Petitioner about whether he wanted a lawyer, Det. Smith indicated that this was covered by the warning form. (TT at pp.143-144.) He explained that the form was read to Petitioner immediately before he was questioned, which questioning, he had stated, was done by Det. Logan. (TT at p.141, 144.) Asked how long

Petitioner had been in custody before the form was read to him, he stated that it was as long as it took for the blood draw, perhaps an hour. (TT at p.144.) While he agreed that his name appeared on a report concerning Petitioner's questioning, he stated that Det. Logan did the interview after he and Det. Rush had read Petitioner his rights. (TT at pp.146-151.)

Det. Logan testified that he had contact with Petitioner at approximately 4:00 p.m. on October 22, 2004, when he was asked to interview him; he was aware that Petitioner had been brought to the office by Dets. Rush and Smith. (TT at pp.173-174.) He stated that he explained to Petitioner that he had already been read his rights by these detectives, and that he was making sure that Petitioner still understood those rights and what he was being questioned about. (TT at p.176.) Petitioner stated that he understood his rights, he was willing to waive them, and he was willing to talk to Det. Logan. (TT at p.176.)

Det. Logan testified that Petitioner had agreed to place a statement on tape, but, when the equipment was brought into the room he had second thoughts. (TT at p.190.) He then gave Petitioner his notes to read and to make corrections to if he wished; Petitioner made several corrections and then told the detective the notes were a correct reflection of his statement. (TT at p.191.) Petitioner signed each panel of the notes, which were admitted into evidence. (TT at pp.191-192.)

On cross-examination, Det. Logan stated that his understanding was that Petitioner had been brought to the homicide office from the jail by Dets. Rush and Smith, but he did not know how Petitioner got to the jail or how long he had been there. (TT at pp.205-206.) He believed that those detectives had been with Petitioner for about an hour. (TT at p.208.) While Attorney Elash asked if it was not true that there were no reports reflecting an interview between those

detectives and Petitioner, Det. Logan was not willing to say whether there was such a report in the file.  (TT at pp.208-209.)  Det. Logan was extensively questioned about the methods he utilizes in speaking with a suspect, and in speaking with Petitioner in particular.  (TT at pp.209-233.)

Det. Rush also testified that from the time Petitioner was picked up at the jail until he was taken to the homicide office after the blood draw was perhaps an hour.  (TT at p.250.)  He agreed that once Petitioner was at the office, he and his partner executed a rights warning form with him; he stated that this would have happened immediately.  (TT at p.250.)  Det. Rush stated that he and his partner did not interview Petitioner, and therefore did not prepare a report.  (TT at p.251.)

Det. Rush believed that the interview with Det. Logan lasted an hour or two, and stated that as soon as the statement was completed, they transported Petitioner back to the county jail.  (TT at p.251.)  He agreed that, in the car on the return to jail, they had a conversation with Petitioner about his teeth, and agreed that he did not document this conversation.  (TT at p.252.)  Det. Rush was unaware of any interview of Petitioner other than that conducted by Det. Logan.  (TT at p.252.)

At the evidentiary hearing on July 20, 2009, Petitioner indicated that he wrote a letter to Attorney Elash asking him to file a suppression motion.  (HT at pp.22-23.)  Asked what the basis was for such a motion, Petitioner stated:

> The issue was I asked – I was interrogated prior to Detective Logan interrogating me and at which time I has asked – the detective told me that – well, I wanted a lawyer and I didn't have no more to say to them because they were twisting things I was saying, and I told him I want an attorney, and if it was all right with the attorney, I would speak to them.  Then they took me to the county jail, and it's my

understanding that that would have made Detective Logan's interrogation of me unlawful.

(HT at p.23.) Petitioner also stated that he had been threatened by Detective Rush and Detective Smith, and that he made Attorney Elash aware of that as well. (HT at p.24.) He stated that those detectives arrested him the day before Det. Logan "came to speak with him" (counsel's words), and that he could not recall if Det. Logan re-Mirandized him. (HT at pp.24-25.)

Asked if he thought that he didn't have to speak to Det. Logan because he previously had invoked his right to counsel, Petitioner stated:

> Well, yes, I didn't think I had to talk to him. And they had told me that – the whole thing – they were telling me things like they weren't going to charge me, that Logan was the guy that was going to decide whether or not I get charged or not, and the whole thing during this whole interrogation, I did not do this, so I didn't feel that I had anything to hide. I didn't feel that – you know, why not talk to him.

(HT at p.25.)

Petitioner stated that he had been told by Attorney DiLucente and Attorney Elash right up to the time of trial that they could have a suppression hearing right before the trial. (HT at p.25.) He stated that when Attorney Elash attempted to explain to him that he didn't want to have a suppression hearing "he wasn't making no sense" and that he thought that "the legal aspect of the interrogation was more important than giving [Det. Logan] a chance to rehearse [his testimony]." (HT at pp.26-27.)

On cross-examination, Petitioner stated that he believed that what the detectives had said to him was a threat. (HT at p.29.) He stated that he did not confess to Det. Logan (HT at p.29), and that the detective had lied in court when he said that he had done so (HT at pp.29-30).

14

Attorney Elash also was questioned on this point. Asked if he had received a letter from Petitioner dated October 3, 2007, in which Petitioner requested that a suppression motion be filed and suggested the basis for such a filing, Attorney Elash could not recall, but he stated that "[a]fter talking to Mr. Greer, I wasn't going to take my legal advice from him." (HT at p.11.) In particular, he stated that he had considerable experience in cross-examining Det. Logan, and believed that a suppression motion would provide the detective with "a dress rehearsal for trial" without providing any chance at success. (HT at p.12.)

On cross-examination, Attorney Elash stated that he had cross-examined Det. Logan many times and had transcripts containing information that he would try to bring out. (HT at p.15.) He stated, "he knows what I'm going to bring out, and I know basically what he's going to say I hope sometimes, and hopefully he says something that makes it even more helpful for the defense." (HT at pp.15-16.) He agreed that part of his strategy was to attack Det. Logan's credibility concerning the confession, noting that "after talking to Mr. Greer, there's no way he gave any type of logical confession to anybody." (HT at p.16.)

Asked what basis Petitioner had suggested for the motion to suppress, Attorney Elash stated that he thought it might have been that "his capacity was diminished" either due to the length of the questioning or his state of mind at the time, but was not sure that was the basis. (HT at p.18.) Again he emphasized that if he thought he could have filed a successful suppression motion he would have, but in this case he "thought it was nothing more than a dress rehearsal for the Commonwealth." (HT at p.18.)

Following the evidentiary hearing, the court denied this claim. In his Opinion on appeal, Judge Cashman addressed this claim as follows:

In reviewing the record in this case, it is clear that Greer was advised both orally and in writing of his Miranda rights and, in fact, executed the form waiving those particular rights. Shortly after the execution of that form, he was interviewed by Logan and at the end of that interview; he reviewed Logan's notes, made corrections to those notes, and then signed Logan's notes. At one point Greer even agreed to have his final statement tape-recorded. The record in this case does not disclose any type of threat or the indication that Greer invoked his right to counsel.

(ECF No. 10-3 at p.17.) The Superior Court adopted Judge Cashman's Opinion as its own when it affirmed the denial of PCRA relief on appeal. (ECF No. 10-4 at pp.36-37.)

In order to be entitled to relief on this claim, Petitioner has to show that the state court's decision was either "contrary to" or "involved an unreasonable application of" clearly established Federal law as determined by the Supreme Court of the United States, or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2).

First, in determining whether the state court's decision is "contrary to" Federal law under § 2254(d)(1), this Court notes that the Third Circuit Court of Appeals has held that Pennsylvania's three-part standard for judging ineffectiveness claims does not contradict the Supreme Court's holding in Strickland. *See* Werts v. Vaughn, 228 F.3d 178, 203 (3d Cir. 2000). In this case, the state court utilized the same three-part standard in evaluating Petitioner's ineffectiveness claims. Therefore, its determination that trial counsel was not ineffective in failing to file a motion to suppress Petitioner's statements to Det. Logan was not "contrary to" established Supreme Court precedent.

Next, the Court must determine whether the state court's application of Strickland to Petitioner's ineffectiveness claim was objectively unreasonable as provided in § 2254(d)(1); *i.e.*, the state court's decision, evaluated objectively and on the merits, resulted in an outcome that

cannot reasonably be justified under Strickland. Under the facts of this case, the Court finds that the state court's determination that trial counsel was not ineffective for failing to file a motion to suppress was not an unreasonable application of Strickland's ineffectiveness standard.

In examining the deficient performance prong of an ineffective assistance of counsel claim, it is generally presumed that an attorney acted in an objectively reasonable manner and that an attorney's challenged conduct *might* have been part of a sound trial strategy. *See* Strickland, 466 U.S. at 689 (citing Michel v. Louisiana, 350 U.S. 91, 101 (1955)). Where it is shown that a particular decision was, in fact, an adequately informed strategic choice, the presumption that the attorney's decision was objectively reasonable becomes "virtually unchallengeable." Id. at 690-91. These presumptions, however, should not obscure the overriding, and ultimate determinative, inquiry courts must make under Strickland's deficient performance prong: whether, after "considering all the circumstances," counsel's performance fell "below an objective standard of reasonableness." Id. at 688. "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." Roe v. Flores-Ortega, 528 U.S. 470, 480 (2000) (citing Strickland, 466 U.S. at 688).

As explained by Attorney Elash at the PCRA hearing, counsel's failure to file a motion to suppress was based on his extensive experience in examining Det. Logan in court and his belief that there was not only no reasonable basis to file a motion to suppress but it would be nothing more than a dress rehearsal for Det. Logan's testimony at the time of trial. Counsel electing a different course in the exercise of his experienced legal judgment (a strategic choice), or recognition of the non-maintainability of Petitioner's desired challenges or assertions, is not the ineffectiveness in representation that Petitioner purports. In this situation, trial counsel's failure

to file a motion to suppress was not objectively unreasonable and therefore his performance was not deficient in this regard.

Furthermore, Petitioner has not shown that there is a reasonable probability that, but for trial counsel failing to file the motion to suppress, the result of his trial would have been different. *See* Strickland, 466 U.S. at 694; *see also* Jacobs v. Horn, 395 F.3d 92, 105 (2005) (He "need not show that counsel's deficient performance 'more likely than not altered the outcome in the case' – rather, he must show only 'a probability sufficient to undermine confidence in the outcome.") (quoting Strickland, 466 U.S. at 693-94). Petitioner must show that he would have likely prevailed on the suppression motion and that, having prevailed, there is a reasonable likelihood that he would not have been convicted. Assuming the motion would have been granted, and Petitioner's statements to Det. Logan suppressed, the Court cannot say that such reasonable likelihood existed especially given the inculpatory DNA evidence presented at trial; that Petitioner's blood matched that found on the victim's bedsheet.

Finally, the state court's rejection of this claim was not premised on an "unreasonable determination of the facts" within the meaning of § 2254(d)(2). In this case, there was evidence presented at the PCRA hearing that Attorney Elash's decision to forgo filing a motion to suppress was strategic based on his belief that it would serve no purpose other than to provide Det. Logan with a dress rehearsal for his testimony at trial. There was also evidence presented at the hearing which demonstrated that there was no reasonable basis for the filing of that motion because Det. Logan interviewed Petitioner shortly after Petitioner waived his Miranda rights and he even reviewed, corrected and signed Det. Logan's notes at the end of the interview. In light

of the evidence presented, the state court's conclusion that counsel was not ineffective for failing to file a motion to suppress was not based on an "unreasonable determination of the facts."

Petitioner has not shown that he is entitled to habeas relief on this claim and it is therefore denied.

### B.  Interfering with the right to testify.

Petitioner's second claim is that Attorney Elash interfered with his right to testify at trial. *See* U.S. v. Teague, 953 F.2d 1525, 1535 (11th Cir. 1992) (Where a defendant claims that his right to testify was violated by defense counsel, the claim is properly framed as a claim of ineffective assistance of counsel.)  Specifically, he claims that Attorney Elash threatened to quit if he chose to testify.

At trial, Petitioner participated in a colloquy with the court concerning his right to testify at trial.  Initially, against the advice of his attorneys, Petitioner expressed an interest in testifying on his own behalf at trial; however, Petitioner ultimately made a voluntary, and informed, decision not to testify.

After the Commonwealth had completed its case, but before the Commonwealth formally rested, a morning break was taken.  (TT at p.305.)  Judge Cashman then engaged in a colloquy with Petitioner concerning his right to testify and his right to present character witnesses, and Petitioner indicated that he intended to testify.  (TT at p.307.)

> THE COURT: Under the Constitutions of the United States and the Commonwealth of Pennsylvania you have an absolute right to remain silent.  That is, you are not required to testify.  If you would exercise your right to remain silent, then the jury would be instructed they could not infer guilt from that decision.  The jury further would be instructed they could not draw any inference adverse to you as a result of your decision to exercise your constitutionally-protected right to remain silent.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT: Under the same Constitutions you have an absolute right to testify in this matter, then you would be subject to cross-examination by Ms. Brandstetter as to any and all matters that might touch upon your direct testimony.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT: Have you had a full and ample opportunity to discuss with your counsel the question of whether or not you should testify?

THE DEFENDANT:   Yes.

THE COURT: Have you made a decision as to whether or not you should testify?

THE DEFENDANT:  Yes.

THE COURT: What is your decision, sir?

THE DEFENDANT:  I am going to testify.

THE COURT: Is this a free and voluntary decision on your part to testify?

THE DEFENDANT:  Yes.

THE COURT: Has anybody forced, threatened, coerced you into doing so?

THE DEFENDANT:  No.

THE COURT: Have you had any drugs or alcohol within the last 48 hours?

THE DEFENDANT:  No, sir.

THE COURT: Do you take any prescriptive medications?

THE DEFENDANT:  No.

THE COURT: Do you suffer from any mental illness or disability which would affect your ability to make this decision?

THE DEFENDANT:  No, Sir.

Attorney DiLucente then indicated for the record that he had advised Petitioner not to take the stand, but that, after the colloquy, Petitioner had decided, against his advice, to testify; Attorney Elash concurred in this remark.  (TT at p.310.)  This exchange then followed:

> THE COURT: Mr. Greer, you understand while your counsel may give you advice as to the question of whether or not you should testify, they cannot make the decision for you.  Do you understand that?
>
> THE DEFENDANT:  Yes.
>
> THE COURT: Understanding the fact that your counsel has indicated that he has advised you he does not think it was in your best interest to testify, are you still going to testify?
>
> THE DEFENDANT:  Well, Your Honor, I am not fully understanding exactly why they don't want me to take the stand.  I haven't had –
>
> THE COURT: Why don't you have a seat and talk that particular question over.
>
> (Defense counsel and defendant confer.)
>
> THE COURT: Mr. Greer, are you going to testify?
>
> THE DEFENDANT:  No, sir.
>
> THE COURT: Is this a free and voluntary decision on your part?
>
> THE DEFENDANT:  Yes.

(TT at pp.310-311.)

At the PCRA hearing held on July 20, 2009, Petitioner testified that he wanted to testify but that Attorney Elash told him that he would quit if he did.  (HT at pp.19-20.)  He agreed that he had engaged in a colloquy with the court concerning his right to testify, but stated that he "was told to just say yes to all the questions."  (HT at p.21.)  Petitioner then reiterated that the

only reason he did not take the stand was because of Attorney Elash's threat to quit mid-trial. (HT at p.22.)  When asked if he at all times wanted to testify, Petitioner stated:

> Yes, I did.  I felt that I had to.  Up to the point where it was time for me to take the stand, I don't think there was a sufficient denial of me committing this crime.
>
> . . .
>
> I mean they was cross-examining the witnesses that the prosecution put up here and it amounted to a little more than a reiteration from their direct testimony, just cleared up.  I mean, it was – I'm not even sure if anybody actually said I didn't do it.

(HT at p.22.)  Petitioner agreed that it was his belief that his testimony was the only defense he had available.  (HT at p.22.)

On cross-examination, Petitioner reiterated that his answers during his colloquy were what he had been instructed to say by his attorney.  (HT at pp.27-29.)  He also agreed that he did not tell the court that Attorney Elash had threatened him.  (HT at p.29.)

At the PCRA hearing, however, Attorney Elash explained that he spoke with Petitioner about testifying on his own behalf, that Petitioner would be committing "suicide" if he took the stand, that the jury would convict Petitioner in their minds before he even finished his testimony, that Petitioner had many different version of what actually occurred the night of the murder, and that Petitioner, while initially expressing a desire to testify, ultimately voluntarily concluded (after speaking with his attorneys) that it was not in his best interest to testify.

Specifically, at the PCRA hearing, Attorney Elash explained that it was "absolutely" his opinion that Petitioner should not testify, agreed that at some point Petitioner wanted to testify, and stated that he "didn't physically restrain him to stop him from testifying."  (HT at p.7.)  He agreed that after several extended conversations, he had written a note that said, "If you want to be a fucking idiot don't do it while I represent you.  If you will not listen to me I will quit."  (HT

at pp.7-8.)  He also verified a handwritten statement that read, "I John Elash talked Virgil Greer from testifying in his case.  I believed it was in his best interest," signed John Elash and Phil DiLucente.  (HT at p.8.)

Attorney Elash explained that Petitioner's "story" was the most incredible he had heard in thirty-four years of practice, and that his basis for advising Petitioner not to testify was that he thought he would not be credible.  (HT at p.8.)  On cross-examination he elaborated:

> Well, first of all it wasn't just one story.  It was several stories.  He prefaced most of his stories saying he was very high on cocaine at the time which always to me is – I had never liked to present the defense an admission of another crime to get a defense on a more serious crime.  But he had talked about being at the woman's house a week before and had talked about having to jump out the window because somebody was coming in, and he really did not fully explain what happened at the time.  And then he talked about people coming up the stairs and cutting his hand on a 45-ounce can – or a can of Colt 45 malt liquor, something like that.  That was how he got the blood all over – that's how the blood – his blood got all over the room.  Then he would say – the last thing he said – well, during one of the many conversations that I had with him and also Phil had with him, he said, "You know, I really don't even remember what happened."  So that's exactly what he said to me.

(HT at pp.13-14.)  Attorney Elash stated that he believed that if Petitioner gave this account to the jury "the jury would want to execute him at that point instead of listening to the rest of his testimony."  (HT at p.14.)  Attorney Elash agreed that he didn't "restrain" Petitioner or "prevent him" from making his own decision whether to testify, but stated that he "used vulgar language to explain to him the strength of my idea that, you know, he's committing legal suicide by trying to take the stand and who knows what he was going to say."  (HT at p.14.)  He reiterated that he believed it would have been "sheer disaster" for Petitioner to testify.  (HT at p.15.)

Following the PCRA hearing, the court denied this claim.  On appeal, the Pennsylvania

Superior Court affirmed the denial of PCRA relief, adopting Judge Cashman's December 27,

2010 Opinion as its own.  In his Opinion, Judge Cashman addressed this claim as follows:

> It is abundantly clear that the trial strategy adopted by Elash in this case
> that the Commonwealth could not prove its case beyond a reasonable doubt was
> the only possible one that might have been successful.  Greer would have never
> have been subjected to a grueling cross-examination with respect to his numerous
> stories concerning Washington's death and his inability to remember what
> happened on that night in light of his use of cocaine.  Additionally, the record
> contradicts his contention that he did not clearly and voluntarily make the
> decision not to testify in this case.  Although Greer maintains that he was advised
> to answer all of the questions that this Court asked of him by saying "yes", the
> record clearly demonstrated that that is not what happened.  A review of the
> colloquy in this case shows that Greer was asked whether or not anyone forced,
> threatened or coerced him into making his decision not to testify and he answered
> unequivocally that he had not been.  He was also asked whether or not he had any
> mental illness or disability, which would affect his ability to make that decision,
> and again, he answered "no".  Greer was also asked whether or not he had any
> drugs or alcohol during the previous forty-eight hours before making this decision
> and again, he answered "no".  The colloquy that this Court conducted with him
> clearly demonstrates that his decision not to testify was freely and voluntarily
> made and was not the product of some coercion or threat made by his counsel.  As
> Elash observed, he had to be forceful with Greer in making his opinions known,
> especially when it came to the question of whether or not Greer should testify.

(ECF No. 10-3 at pp.15-16.)

As previously stated with respect to Petitioner's first claim, the state court's

determination that counsel was not ineffective with respect to Petitioner testifying was not

"contrary to" established Supreme Court precedent.  *See* Werts, 228 F.3d at 203.  Additionally,

the state court did not unreasonably apply the ineffectiveness standard when it determined that

counsel was not ineffective.

Petitioner's claim of ineffective assistance of counsel boils down to a disagreement with

his counsel's trial strategy.  It is not uncommon for trial counsel and a defendant to disagree as to

whether the defendant should testify. "The decision whether a criminal defendant should take the witness stand in his own trial unquestionably has tremendous strategic importance. . . . . If counsel believes that it would be unwise for the defendant to testify, counsel may, and indeed should, advise the client in the strongest possible terms not to testify." Teague, 953 F.2d at 1533. However, "if defense counsel refused to accept the defendant's decision to testify and would not call him to the stand, counsel would have acted unethically to prevent the defendant from exercising his fundamental constitutional right to testify." Id. at 1534. In such a situation, "defense counsel has not acted within the range of competence demanded of attorneys in criminal cases and the defendant clearly has not received reasonably effective assistance of counsel." Id. (internal quotations and citations omitted).

The state court's rejection of Petitioner's ineffective assistance claim was not an unreasonable application of the Strickland standard. Trial counsel's performance is not constitutionally deficient where counsel advises the defendant of his right to testify, but also advises defendant that he should not exercise that right because it would be unwise. Campbell v. Vaughn, 209 F.3d 280, 291 (3d Cir. 2000) (citing Teague, 953 F.2d at 1534-35). There is no doubt that Attorney Elash advised Petitioner that it would be unwise for him to testify and admittedly did so in somewhat inappropriate language. However, the state court found that Petitioner's decision not to testify was freely and voluntarily made and was not the product of coercion or threat by counsel. Petitioner has not rebutted this finding of fact by the state court that the waiver of his right to testify was knowing, voluntary and intelligent. See 28 U.S.C. § 2254(e)(1) (state court findings of fact must be afforded a presumption of correctness that the petitioner can rebut only by clear and convincing evidence). Furthermore, this determination of

the facts in light of the evidence presented at the PCRA hearing is objectively reasonable. Therefore, Petitioner's claim of ineffective assistance of counsel does not warrant relief under § 2254(d).

### C.  <u>Failure to challenge the prosecution's case.</u>

Petitioner's third claim of ineffective assistance is that Attorney Elash failed to challenge the prosecution's case.  Specifically, Petitioner maintains that, at trial, Attorney Elash failed to challenge Petitioner's confession given to Det. Logan, as well as the DNA evidence submitted by the prosecution.

Petitioner failed to raise this claim in his PCRA appeal to the Pennsylvania Superior Court and, as such, it is unexhausted.  *See* O'Sullivan v. Boerckel, 526 U.S. 838 (1999) (a petitioner must present every claim raised in the federal petition to the state's trial court, intermediate appellate court and highest court before exhaustion will be considered satisfied). Furthermore, any attempt to go back and raise the claim in a subsequent PCRA Petition would be futile because such petition would be time-barred by the statute of limitations contained in the current version of Pennsylvania's PCRA statute, 42 Pa.C.S.A. § 9545(b).  Thus, the claim is procedurally defaulted and barred from habeas review unless Petitioner can establish "cause" for the default and "prejudice" attributable thereto, or a fundamental miscarriage of justice.  *See* Coleman v. Thompson, 501 U.S. 722, 750 (1991).  In this matter, Petitioner has failed to plead, let alone prove, "cause" and "prejudice" to overcome the procedural default.[3]  Likewise,

---

[3] To satisfy the cause standard, a petitioner must demonstrate that some objective factor external to the defense impeded his or her efforts to raise the claim in state court.  McCleskey v. Zant, 499 U.S. 467, 493 (1991); Murray v. Carrier, 477 U.S. 478, 488 (1986).  To show prejudice, a petitioner must demonstrate that the error worked to his actual and substantial disadvantage,

Petitioner has failed to plead and establish a fundamental miscarriage of justice.[4]  Therefore, the claim must be dismissed.

However, notwithstanding the aforementioned procedural default, this claim is without merit even if the Court were to review it *de novo*.  Based on the following summary of trial testimony, Petitioner's counsel were not ineffective in the manner alleged.

At trial, Det. Foley testified that he reported to Apartment 612 Village Road, the victim's apartment, to process the crime scene.  (TT at pp.48-52.)  Det. Foley stated that the victim was found in a pool of blood in a bed in the front bedroom.  (TT at pp.70-71.)  He also testified that blood samples were recovered from the kitchen, bedroom wall, front wall, bedding, and pillow case.  (TT at p.75.)

On cross-examination, Attorney DiLucente questioned Det. Foley regarding, among other issues, possible suspects involved in the case, the samples taken, and the search warrant executed for certain evidence.  (TT at pp.81-96, 98.)

At trial, Dr. Shakir, forensic pathologist for the Allegheny County Medical Examiner's Office, testified that the victim's body showed the early signs of decomposition when Dr. Rozin conducted the autopsy.  (TT at p.105.)  Dr. Shakir testified that there was evidence of stab

_____

infecting his entire trial with error of constitutional dimensions, not merely that the error created a "possibility of prejudice."  Carrier, 477 U.S. at 494.

[4] Where a petitioner cannot make a showing of "cause and prejudice," a federal court may nevertheless consider the merits of his or her unexhausted claims under circumstances in which the failure to adjudicate such claims would result in a "fundamental miscarriage of justice." Coleman, 501 U.S. at 750.  This exception to the procedural default doctrine is based on the principle that, in certain circumstances, "the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration.'"  Carrier, 477 U.S. at 495 (quoting Engle v. Isaac, 456 U.S. 107, 135 (1982)).

wounds on the victim's neck, chest, and upper and lower extremities.  (TT at p.105.)  Dr. Shakir also testified that there was evidence of blunt force trauma on the victim's face.  (TT at p.105.)  The wounds in the victim's chest were the most severe and the cause of the victim's death.  (TT at pp.108-09, 117.)  There was a stipulation that the blood found on the victim's bed sheet matched Petitioner's blood.  (TT at p.130.)

On cross-examination, Attorney DiLucente questioned Dr. Shakir about the victim's stab wounds, how those wounds were inflicted, and with what instrument those wounds were inflicted.  (TT at pp.118-19.)  Attorney DiLucente also extensively questioned Dr. Shakir regarding DNA found on the victim and at the crime scene.  For example, Attorney DiLucente cross-examined Dr. Shakir about (1) the hair samples retrieved from the victim's hands, (2) the blood types found at the crime scene and how many of those samples were brought in for testing, (3) the blood transfer capability from the victim's body to the assailant, and (4) the bite marks found on the victim.  (TT at pp.119-121, 123-124, 126-128.)

Mr. Meyers, manager of the DNA and Serology Units of the Allegheny County Office of Medical Examiners, Forensic Lab Division, testified on direct examination regarding the DNA test results placing Petitioner as a source of the blood in the victim's bedroom.  (TT at pp.277-280.)  On cross-examination, Attorney DiLucente questioned Mr. Meyers extensively about the DNA evidence presented to the jury.  (TT at pp.293-303.)  The trial transcript reveals that Attorney DiLucente's questions included, but were not limited to, inquiry into specific blood samples tested and the procedure for that testing, as well as the statistics process when determining whether Petitioner's DNA matched that found at the crime scene.  Id.

Det. Smith of the City of Pittsburgh Police Department, Homicide Unit, testified that he received notification of this match in October, 2004. (TT at p.134.) Det. Smith obtained a search warrant for Petitioner and his DNA and located him on October 22, 2004. (TT at p.136.) Petitioner was taken for a blood draw and then to the City of Pittsburgh Homicide Unit. (TT at p.137.) Petitioner was cooperative with the blood draw, and cooperative through the reading of the rights form, stating that he understood, and he initialed the form, which was then signed by Det. Smith and his partner Det. Rush. Det. Smith noted that Petitioner did not indicate any reluctance in speaking to the police. (TT at pp.137-138, 141, 143-144.)

In twenty pages of cross-examination testimony and six pages of re-cross examination testimony, the record reveals that Attorney DiLucene extensively questioned Det. Smith about the procedures regarding securing a search warrant for Petitioner's DNA, the reading of the Pittsburgh Police Pre-Interrogation Warning Form, Petitioner's cooperation through the reading of the Miranda Warning Form (or pre-interrogation warning form) and through the blood draw, Petitioner's confession after the interview by Det. Logan, and other possible suspects in the case, including fingerprint evidence lifted at the crime scene. (TT at pp.140-160, 164-170.)

Det. Logan interviewed Petitioner on October 22, 2004. (TT at pp.172-173.) Det. Logan testified that he identified himself to Petitioner and Petitioner understood his rights. (TT at p.176.) Det. Logan testified to Petitioner's final statement, in pertinent part, as follows:

> Mr. Greer said that he went into the apartment with Ms. Washington and the two of them sat in their little room drinking a can of beer. As they were drinking a beer, according to Mr. Greer, Ms. Washington asked Mr. Greer if he had any money. Mr. Greer said, yeah, he had some money, and Mr. Greer said Ms. Washington asked Mr. Greer if he was willing to pay $20 for some sex. Mr. Greer said he accepted the offer for the $20 for sex and that he and Mrs. Washington or Ms. Washington went upstairs and they had sex. Mr. Washington or, I'm sorry, Mr. Greer said at this point everything was okay as far as the sexual

29

part.  Mr. Greer stated the problems started after the sex act was completed.  Mr.
Greer said that after the sex was completed Ms. Washington wanted her $20.  Mr.
Greer said he was only willing to pay ten.  According to Mr. Greer, the victim got
mad and, according to Mr. Greer, she's the one who pulled a knife.  Mr. Greer
said that after Ms. Washington pulled the knife, according to Mr. Greer, she came
– Ms. Washington came after Mr. Greer.  However, after a struggle, Mr. Greer
said he was able to take the knife off of Ms. Washington and that's when he
stabbed her.  But after the stabbing he got dressed and left back out of her house.
Mr. Washington, I'm sorry, Mr. Greer said at this point he took a bus from the
projects and went back to Elizabeth, which is where he was staying.  I asked Mr.
Greer how was it he was covered in blood he would manage to get on the bus.
Mr. Greer said he was not covered in blood.  The only blood he recalled was
blood on the side of his pants on the right side.  He said he took the bus, there was
no issue and he went home.

(TT at pp.186-189.)  Detective Logan testified that Petitioner stated that he cut his hand on the

knife.  (TT at p.189.)  Petitioner initially consented to recording his statement, but later refused.

(TT at pp.190-191.)  At the conclusion of the interview, Petitioner signed the notes that the

detective had taken and made corrections.  (TT at pp.191-194.)

On cross-examination, Attorney Elash thoroughly questioned Det. Logan concerning

multiple issues in the case, including concerns by the defense regarding Det. Logan's interview

with Petitioner and the procedures for having Petitioner transported from one location to another

for interviewing purposes, Petitioner's relationship with the victim, how the victim was

murdered, and the DNA recovered from the crime scene and from Petitioner.  For example, on

cross-examination, Det. Logan stated that his understanding was that Petitioner had been brought

to the homicide office from the jail by Dets. Rush and Smith, but he did not know how Petitioner

got to the jail or how long he had been there.  (TT at pp.205-206.)  He believed that those

detectives had been with Petitioner for about an hour.  (TT at p.208.)  While Attorney Elash

asked if it was not true that there were no reports reflecting an interview between those

detectives and Petitioner, Det. Logan was not willing to say whether there was such a report in

the file. (TT at pp.208-209.) Det. Logan was extensively questioned about the methods he utilizes in speaking with a suspect, and in speaking with Petitioner in particular. (TT at pp.209-233.) Further, Det. Logan stated that he and Petitioner talked about blood and hair samples, specifically, Det. Logan informed Petitioner that based on the information he received the blood that was found at the crime scene matched that of Petitioner's. (TT at p.217.)

Based on the above, Petitioner's trial counsel extensively cross-examined several Commonwealth witnesses about the DNA evidence found at the crime scene. Trial counsel also thoroughly cross-examined detectives about the confession Petitioner gave to Det. Logan. Petitioner may believe that his attorneys should have done a better job questioning certain witnesses, but the record does not demonstrate that his attorneys failed to challenge the DNA evidence and his confession, or that they were not functioning as the "counsel" guaranteed by the Sixth Amendment. Accordingly, Petitioner would not be entitled to habeas relief on this claim even if it was not procedurally defaulted.

**D. Certificate of appealability.**

Section 102 of the AEDPA, which is codified at 28 U.S.C. § 2253, governs the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition. It provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." Petitioner has not made a substantial showing of the denial of a constitutional right. Accordingly, the Court will not grant a certificate of appealability. A separate Order will issue.

Dated: September 30, 2015.

/s/ Lisa Pupo Lenihan

Lisa Pupo Lenihan
United States Magistrate Judge

cc: Virgil Londy Greer
HM-7990
10745 Route 18
Albion, PA  16475-0002
*Via First Class Mail*

Counsel of Record
*Via ECF Electronic Mail*

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

VIRGIL LONDY GREER,       )
                                   )       Civil Action No. 12 - 1263
               Petitioner,   )
                                   )
               v.          )       Magistrate Judge Lisa Pupo Lenihan
                                   )
SUPERINTENDENT MICHAEL   )
HARLOW and THE ATTORNEY   )
GENERAL OF THE STATE OF    )
PENNSYLVANIA,           )
                                 )
             Respondents. )

## <u>ORDER</u>

**AND NOW**, this 30th day of September, 2015.

**IT IS HEREBY ORDERED** that the Petition for Writ of Habeas Corpus (ECF No. 3) is **DENIED**.

**IT IS FURTHER ORDERED** that a Certificate of Appealability is **DENIED**.

**IT IS FURTHER ORDERED** that the Clerk of Court mark this case **CLOSED**.

**AND IT IS FURTHER ORDERED** that pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, Petitioner has thirty (30) days to file a notice of appeal as provided by Rule 3 of the Federal Rules of Appellate Procedure.

<u>/s/ Lisa Pupo Lenihan</u>
Lisa Pupo Lenihan
United States Magistrate Judge